Thank you, Your Honor. Good morning. My name is Brad Bagshaw, and I represent the appellant Phil Thorman in Thorman v. American Seafoods Co. The issue in this case is fraudulent concealment. In particular, the issue is whether Phil Thorman, who alleges a breach of his seaman's wage contract, is entitled to toll the limitations on that because of concealment and lack of This case was decided against Mr. Thorman on summary judgment by Judge Zillig. Two issues are raised. First, whether or not there was evidence of affirmative concealment that would require a trial that was submitted below. The first or the principal piece of evidence suggested by the plaintiffs on that regard was that Mr. Thorman received settlement sheets that indicated that his pay was being appropriated based on a percentage of the value of the product produced by the company. The essence of Mr. Thorman's claim is that that statement is not true. Wasn't that a representation of a future fact and clearly made so? No, Your Honor. The value of the future fact? The value representation was made when he was given the settlement sheets in connection with his paycheck after the season was over. How about the posted values on shipboard? The posted values were supposed to be estimated prices. Mr. Thorman's shipboard. And he knew that when he shipped out? Yes, sir. He did know that. Okay. But he expected them to be an accurate estimate of what the company really thought the sales prices were, net of certain sales costs. And the essence of the claim is that that's not true, that what the company did is the company underestimated the price that the fish would sell for and then overestimated its sales costs. And there's substantial evidence of both of those facts in the record. In particular, an expert report that said in 15 seasons at issue and 15 different products, the company underestimated the price 14 of the 15 times and the sum of the costs by quite spectacular amounts. So the essence of the claim is that the company did not fairly make an honest estimate. And the essence of Mr. Thorman's affirmative concealment evidence is that the company misrepresented that it had done so at the conclusion of the season when Mr. Thorman was handed a settlement sheet that said, we're basing your pay on the value. And he took that to mean an accurate estimate of the value, which I think is the natural implication of that. The second issue here is whether or not the company in this situation has a duty to disclose to Mr. Thorman the facts that When you say the value, are you talking about the period production value that's listed on the settlement sheet? Yes, Your Honor. It was in slightly different ways in different settlement sheets. But generally, the nature of it is for a trip, the company would say your percentage is XXX times either the value or in some cases they called it the production value, which the company represented to be one large number, which was its representation of the total value of the product for that season. So the second issue is whether the company had a duty to disclose. Semen lost? What the expert report shows is that it depends somewhat on the products that was I understand that. Just give me a figure. A ballpark is probably in the range of 10% of the pay that a semen How much would that be in dollars and cents? Give me an estimate. That's all I want. Mr. Thorman's average season was roughly $10,000. You can't answer? About $1,000 a season. How much? Roughly $1,000 per season. $1,000 per season per semen? Per season per semen. I could be off 50% one way or the other on that estimate. But that's the ballpark. So the second issue is the duty to disclose. And this turns really on the Garrett case in the Supreme Court said 60 years ago that the analogy between a semen's contract and a contract between a fiduciary and a beneficiary is a close one. And the issue here is whether that analogy encompasses in this sort of situation the fiduciary's normal duty to disclose facts to the basically that the semen needs to know. And in this case, the facts that he'd need to know is that the company is not undertaking a fair and honest estimate of the sales price and the sales costs. I'm going to focus my argument on this issue. And, of course, I'd be happy to answer any questions the bench has. This situation, I think, really cries out for the imposition of the fiduciary-like duties that Garrett and Garrett's progeny have said. Part of the problem I have is the fact that or maybe I should be addressing this to the defendant rather than to you. I'll wait. Okay, Your Honor. As I was saying, the set of facts here cry out for the imposition of the duties to disclose that are normally imposed on a fiduciary. Here we've got a situation where a very important part of the contract depends on the action, the estimate that is made by the company. The company reserved to itself in these adhesion contracts the sole discretion to make an estimate of the product. And the estimate was then done, of course, in the back room of the company without any participation from the semen, based on facts that are particularly known to the company, its own sales costs and its own estimate of sales revenue, which really is based on a long history the company has in selling this product that the semen doesn't have. The semen is unfamiliar with the prices the products sell for. These are, if you look at Appendix B to our brief, it's one of the price sheets. There are 34 different grades, many grades of Serimi and Rowe that are sold in Japan. And, of course, these are not retail prices. They're not wholesale prices. They're essentially producer prices that the manufacturer is selling at. And the amount there turns on costs that are uniquely known to the company, its own sales costs. So the crew member is in a very poor position to understand, to look at that price and know whether it's a fair price or an unfair price. And then in this situation, the company compounded that by keeping the whole process very secret. There's evidence in the record that the director of human resources, who had been a director for many years, the vice president of the company, had no knowledge as to how this process worked. The human resources department are the people that the crew normally come in contact with, of course. Does that seem unusual to you, that somebody in human resources wouldn't be involved with the pricing? I mean, that seems to make perfect sense. I certainly wouldn't expect that person to be involved in the pricing, but that person would be the person who would be answering questions from the crew members about how their pay was computed. And I think there's some evidence there that the jury could look at to determine that, well, this is part of the concealment process that the human resources department doesn't know. The two people that did do it, the former president of the company and the VP of operations, testified below that they didn't disclose how they did it to a single crew member ever in the time that we're talking about here or at any other time. The VP of operations said that he was a factory manager, which is the head of the factory on one of the boats before he became VP of operations. When he was factory manager, he didn't know how this process was done. He only found out when he became the VP of operations and started becoming involved in doing it. So I would submit that Mr. Thorman, as a processor on this ship, is in a very poor position to ever discover how the process is done, whether the process is done fairly, whether the company is using a fair estimate of its costs, or as was happening here, a grossly overstated statement of its costs. The law, for a long period of time since the start of our country, has recognized that people such as Mr. Thorman are in a very difficult position when dealing with their employer. Siemen, of course, as the Court is aware, have long been considered wards of the advocacy court, and the reason was is that they are in a difficult position. The David Pratt case almost 200 years ago said they do not stand on even ground with their employer in making their contracts. Cases have said similar things in giving Siemen special rights in recognition of the fact that they're in a very difficult bargaining position with the company. Right down through the history of this Court, this Court in Orsini in 2001 reversed a summary judgment because the trial court had not recognized the distinct burden that the Garrett case places on the employer as a fiduciary or a fiduciary-like party. Now, the company's response to the long line of cases from here ñ The Siemen and the ship's captain do not deal at arm's length? Absolutely correct, Your Honor. And that the employee or the contract is submitted, it's reviewed by the employee, if he wants to sign it, it's up to him, he's not forced to take it by anybody? He's not forced to take it, Your Honor. It's a printed form contract. And it's all above board, and the face of the contract is completely disclosed to the employee? The contract is certainly given to the employee. And under these circumstances, you say there's a fiduciary relationship? He can take it to his own lawyer if he wants? He can reject it if he wants? What Garrett says, Your Honor, is it's a fiduciary-like relationship. He says there's an analogy. Fiduciary-like or fiduciary-heavy? You want to get the word fiduciary in there, and I want to know what's fiduciary about it? I would say that one has to look at the particular provision in the contract that we're dealing with. In this case the employee read it and could reject it, right? The employee certainly read it and could reject it, Your Honor. Okay. And similarly, Your Honor, if I hire an agent to sell my house for me or to be my lawyer, I, of course, can read the contract of the agent, and I'm an intelligent person, I can understand it. But nevertheless, that agent owes me fiduciary duties with respect to the way he performs that contract. And the essence here is the performance of this contract that's at issue. And the performance issue is that Mr. Thorman, by necessity, by the way the contract is set up, must trust the company to give him a fair and honest estimate of the price and the sales cost. He has no choice. And what representation is made in the contract with respect to the manner of posting the pricing board? There are several things. What the contract says is that the company will post a sales price. So they use the word sales, which Mr. Thorman took to mean the price they're selling it at. I don't care what he took it to mean. The contract says the sales price will be posted. Correct, Your Honor. And the company did that. And the company did that, Your Honor. Before it sailed. No, the company did it after they sailed, Your Honor. The way this company worked is the crew member signed the contracts, got on board the boat, the boat headed for Alaska, then the company posted these lists of prices and based the pay based on the posted prices. The contract also says, the contract warns the crew member, says, well, the price could be more or less than the actual sales price. And the contract reserves to the company the discretion as to how to do it. But the theory of our case, Your Honor, is that by saying that, the company's emphasizing the fact that it's estimating the market price. Now, it's telling the crew member, hey, our estimate could be off. We could be high. We could be low. We're not perfect. We do the best we can. That is the essence of what the representation to the crew member is. And what this case is about is the company did not do the best it could. The company looked at its costs, for example, and it said, we're going to charge the crew 5% for an allowance of returns. Their historical returns were a few tenths of 1%. They did the same thing with the sales costs. Another 3% for the sales costs. Historically, it was about two-tenths of a percent was what their sales cost. In the middle of this period, with respect to the return costs, what the company did at the recommendation of its accountants is it said, on our financial statements, we're not even going to make an allowance for returns anymore because it's so small it's no longer material. And the company kept right on charging the crew 5% every time, even though the accountants said it's immaterial because it's just a tenth or two. That, we submit, is not being fair and honest with the crew when it makes that sales price estimate, which it posts after they've shipped to Alaska and really have no way to protect themselves. So it's not that signing of the contract that we think is important or the ability to read the contract. It's the way the contract was performed. It was performed in a way that the crew member really was taken advantage of, and he had no basis to figure that out. And that's why we think it's very important that a duty to disclose be placed here, and it's very consistent with this Court's decisions and with the Supreme Court's decisions, starting with Justice Story's Hardin v. Gordon right through this Court's Orsini decision just several years ago. Why then, if this is the case, did Congress put what seemed like somewhat onerous limits on the seaman's ability to challenge the wages? Are you referring to the limitations provision, Your Honor? Well, the statute you're referring to is 10601. It imposes a six-month limitation on seaman's ability to make in rem claims. It doesn't affect the in personam claims. That's taken care of by the contract here. Right. There's no legislative history. I don't think there are any decisions of this Court that explain it in any great detail. One decision of this Court says, well, one of the benefits we're going to give to the company is this short limitation provision in exchange for the requirement that the company has to enter into a written contract, which is not at issue here. I guess I would guess that the fact that vessels, that in rem claims, are liens on the vessel is a consideration here, most certainly. But nevertheless, I would also suggest to you that the fact that it's very short makes it especially important that the doctrine of fraudulent concealment apply when there's a situation where the company is taking advantage of the seaman because the risk to the seaman in that short limitation period is greater. He's more vulnerable to be taken advantage of, especially if he could be back out at sea on another trip, the six months is gone, and he's got no realistic opportunity to discover the facts of his claim before the claim is gone and he's lost the benefit. So I'm wondering whether in the contract he would have the right to demand this information. There's nothing in the contract that gives him that right, Your Honor. And I have about 4 minutes left, and I just assume we're observed for rebuttal. That's fine. Counsel, I have a procedural question that really doesn't go to the merits, and I don't want to charge against your time. You filed your opening brief, and at the bottom you said, filed under seal, and then when I get my copy, it's all stamped with red stamps that say seal. I looked at the docket sheet, and I don't find any order of this Court by either through the staff attorneys or a judge that ordered your brief sealed. Is that correct? This Court has not entered an order. The Court below entered a protective. Are you aware of the general common law rule that briefs are available for public to examine at any time? The press is free to go down and examine any brief that's been filed in the Ninth Circuit. Your Honor, Mr. Foreman. Do you have some particular security reason, and the Court orders them sealed? Your Honor, Mr. Foreman has no objection to these briefs being unsealed. The reason we did Why did you put sealed on the brief on your own motion? Because, Your Honor, I was concerned that since the brief disclosed facts that were given to us subject to a protective order below, that we might disclose them. Prior to filing, I did write a letter to counsel for defendant asking counsel for clarification if they would agree to waive that limitation on appeal and defendant refused to do so. And I was doing it because I was being careful. Perhaps you should address the rest of that question. Their briefs are not filed under seal either. They're not filed under seal. The briefs of defendants are not filed? Yes. Well, that surprises me, Your Honor. I didn't notice that. I think there's probably been continuing confusion between the carryover of the protective order in the trial court and the appellate court sometimes. Your Honor, we were just trying to be careful. Thank you. Good morning, Your Honors. Good morning. My name is J.D. Stahl. And with me at the counsel table is Jay Zuloff. Mr. Zuloff and I are counsel for the defendants Appellees, American Seafoods Company, LLC, and ASC, Inc. For convenience, I'll simply refer to both companies as ASC. With the Court's permission, I would like to place on the ESL a chart that appears on page 22 of our appellees' brief. That's fine. Thank you, Your Honor. There is no dispute in this case that Mr. Thorman's breach of contract claims are barred by the six-month contractual limitations provisions in each of his crewmember agreements, but for his ability to invoke and establish the doctrine of fraudulent concealment. As the briefs indicate, each of his crewmember agreements contained a provision that required him to bring any claim arising out of his agreement within six months of the completion of the agreement. I think it's very important to note that Mr. Thorman admits that whenever he signed these contracts, he read that provision and in his words understood, quote, if you want to put a claim against your employer, you have six months after the end of the term of the contract to do so. That's at ER 459. The enforceability of these six-month contractual limitations provisions in written fishing agreements is well settled in this circuit under the Fuller v. Golden Age decision, which relied heavily in the fact that such provisions are consistent with Congress's decision to impose a similar six-month limitations period on Siemens in rem wage remedies, and that's the 46 U.S.C. 10602 Fishing Agreement Statute that the Court's previously inquired of opposing counsel about. Counsel. Yes, Your Honor. I look at this case not as a Siemen wage case, but I look at it as a profit-sharing case, and that's what this case is actually all about, profit-sharing between the shipowner and the employees on the ship. In profit-sharing cases, the books are always open to the parties to the profit-sharing program, and there's no time limitation under the law because you have a fiduciary duty to open the books. Now, why didn't you open the books to this to these people? Well, a couple of responses, Your Honor. Number one, Mr. Thorman never asked. It's undisputed in this case that not once, notwithstanding his testimony that he was always concerned about his pay, not once did he or anyone on his behalf make any effort to go to the company and say, I'm curious about how you set the posted prices. Would you mind telling me? Siemen don't understand the fine distinction between wages and profit-sharing, and you can't expect them to go ahead and do these things. That's why the law always protects the Siemen. Well, Your Honor, there's a more basic, I believe, response to your concern. This contract, and in particular the use of the posted price system for valuing the product in advance of when it's produced, much less in advance of when it's sold, was specifically to avoid the uncertainty of valuing product for purposes of, as you've suggested, a profit-sharing crew-share arrangement in a situation where the product in some instances may not be sold for three, six, up to a year after it's produced. And so to address that, and indeed some of this Court's prior jurisprudence, such as the Brinson v. Linda Rose joint venture case cited in our briefs, involved disputes over contracts, unlike the one at issue here, that did say we are going to value the share, the crew-share, on a profit-sharing basis. That is to say, we're going to base a crew-share on the actual value of the product, or if it's not sold, on the estimated value of the product at the time of offload. But that arrangement is inherently fraught with conflict of interest in the estimation, and with the uncertainty of somebody later coming back and taking issue with how you've done the estimate. ASC attempted to address that, and I think did so in a very straightforward manner. And what it said is, we're going to establish posted prices at the commencement of each trip, before one pound of fish is produced, and before, long before the product is ever sold. And we're going to publish those in the wheelhouse and in the factory, so that everyone is aware, before any product is produced, what the product is going to be valued at for purposes of the crew's compensation. It's like a unit rate. It isn't a profit-sharing situation, Your Honor. And in this case, there's no dispute that the company properly applied the quantity produced to the posted prices that were published for each trip on the vessel, and that Mr. Thorman and the other crew members received precisely the amount that the contract provided they would receive. How do we know that your costs were actual costs, not inflated costs? How does anybody know that, Mr. Thorman? Your Honor, in a system where the commitment is to pay actual value, or actual value less certain specified costs, as, again, was the case, for example, in the Brinson v. Linda Rose case, then I think it's absolutely appropriate to inquire, if there's a question, about what were the actual sales prices and what were the actual costs. But if you look at this contract, Your Honor, it nowhere, and I'm referring now to the old contract, is the subject of the first five seasons here. There's no appeal from the court's dismissal of the claim under the new contract on independent actual notice grounds. So we're really only focusing today on the old contract. The language of the compensation does not say this is a profit-sharing system. Well, why? Doesn't the law protect seamen from unfair contracts? Hasn't that always been the law? I think, Your Honor, the law protects seamen from contracts that are a product of overreaching or fraud. I don't think the maritime law, notwithstanding all the language of the courts of the court, has said that. The word unfair is not used in any of those cases? The word unfair is certainly used, but it's not enough for somebody to come in and simply use the word unfair or wards of the court and say, therefore, we should set aside this contract or reform the contract. It requires a substantive showing of overreaching or substantive unconscionability or unfairness. And I submit that's never been the claim here. No one has ever come forward to try to assert that there's anything unfair about telling crew members at the beginning of each trip, before they produce one pound of product, how we're going to value the product. The unfairness is not the word that you use in posting. The unfairness may come when you actually state these are my costs. And nobody knows whether that's true or not. Well, Your Honor, if I'm understanding your question, under the posted price system, we don't tell them we're going to estimate our costs or that we're going to tell them our costs. We tell them we're going to tell you for each type of product produced what the value of that product is going to be deemed to be for purposes of our employment relationship. It would be no difference than saying we're going to value each case you produce at $1 or we're going to pay you $1 or, you know, $10 an hour for each hour you're employed. It's a unit rate of valuation. I'm sorry. In some ways it's like a semantic problem here, because it's not value as in market value. We know that. And it's not really price as in the price paid. It's simply here is the stipulated amount and you get a percentage of that. Correct. So then the question comes as to whether there's anything misleading about the way this has been presented, because it's neither value nor price, even though those are the two words that are used by the company. Correct. So it raises an issue. Is there a factual issue as to whether there's been some misleading as to what this number, what you call unit value or amount, what this means? Well, Your Honor, if I could refer to addendum B to our brief. Appendix A, I'm sorry. Appendix A sets forth all of the actual posted price sheets that were published on board the vessel at the commencement of every trip. And, again, they seem to me to be fairly straightforward in identifying for every product that's going to be produced the value or the price, I mean, the monetary amount that each pound or each kilogram of that product is going to be given for purposes of calculating the crew's pay. And I guess I'm not saying that there's been no promise that there's going, that this amount is calculated in a normal accounting sense of sales price, less cost, less some other overhead. Precisely, Your Honor. And the proof of that in the record is the compensation language of the contract itself. And as the district court found, that language does not say we represent or promise that we will post these prices strictly equal to estimates of gross market price. It does not say that anywhere. It says, to the contrary, we will post these prices at our sole discretion. And it says the actual final sale price of this product may be greater or may be lower, but that's not going to affect your compensation. I'm not sure how much more clear this contract could be in disclosing to the crew members that this is not, Your Honor, a profit share situation. It's not a profit sharing situation? No. It's a fixed rate. The only aspect of profit sharing situation here, Your Honor, is quantity. So it's on your preference. No. It's quantity. The only aspect, respectfully, that is subject to a profit sharing-like issue here is that their compensation is still tied to the production of the vessel in terms of the quantities produced. So to that extent, if they had any question about did we accurately report in their settlements how much of which grade of product would produce to apply to the compensation formula in the contract, absolutely they're entitled to that. Absolutely we have a duty to account for that. But do they have the right to come back, as this chart indicates, 54 months, 49 months, 46 months, three years, and in the case of the new contract, no longer than 17 months, do they have the opportunity to come back and say, well, now we're going to take a different interpretation of the contract than one ever articulated, ever promised to anyone, ever even inquired about, and we're going to contend that posted price really means a promise to post estimated sales prices. Never before represented. Mr. Thorman himself, in response to the repudiation of the sole fraudulent concealment allegation in his complaint, Your Honor, in deposition says, no one ever promised that to me. No one ever represented to me that the posted prices would be set equal to gross market prices. There's a further, I think, telling aspect of this on the same line of inquiry, Your Honor, which is the original theory on which this claim was found, filed, and in the discovery responses and so forth, and even up through our motion for summary judgment that led to the dismissal of the case, the plaintiff's original theory was that posted sales price, as used in the contract, must mean strictly an estimate of gross market value of the products without any deduction for anything, no deduction for freight, no deduction for packaging, no deduction for insurance, no deduction for all the typical things, again, as cited in the Brinson v. Linda Rose case, that typically product value, production value in a true crew share situation is adjusted by. Then, in bringing this motion, we pointed out that contrary to the allegation being made by Mr. Thorman's counsel in the interrogatory answers, that, in fact, the company had disclosed in the McCoolins litigation back in 1998 that these are, in fact, net prices. And, again, in connection with the Wynn litigation in 1999 to Mr. Thorman's same counsel, that these were net prices, that these never, never were developed as gross prices. So then they changed their theory, and they said, oh, well, we abandoned that theory. Now we have a new theory, that posted sales price means your best estimate of the gross market price less all of these deductions that you can only take in strict accordance with your, you know, the current level of costs you're having. Again, where is that found in the contract? And so while we're not here today, strictly speaking, to argue about the merits of the case, because the limitations problem that they have renders this claim untimely, I think it's very important to know the merits are very hotly disputed here. And as Judge Zille found, there was nothing in the contract or in anything said to Mr. Thorman that supported the notion that posted prices are a promise to post estimates of sale prices. It's just not there. Now, if I could turn briefly to the fiduciary duty argument. Mr. Badshaw seems to not address at all the two asserted aspects of affirmative concealment, so I'm going to proceed to talk about the thing that I guess is left at issue, which is whether this Court, to salvage Mr. Thorman's claims in this case, ought to recognize a new affirmative duty of disclosure with respect to a contract like this. And as I look at the way they try to define the duty of disclosure, it seems to me that the only defining parameter of it is create a duty here for us broad enough to salvage Mr. Thorman's claims, because in reality, there is no duty to affirmatively disclose how a posted price is derived any more than there's a duty to disclose how an hourly rate is arrived at. The employer-employee relationship, as Your Honor alluded to earlier, is, you know, inherently a conflict of interest situation. And trying to impose upon that a fiduciary-like duty of affirmatively disclosing how a compensation rate is determined, I submit, would completely subvert the essence of an employment agreement. More importantly, these are not facts that warrant this Court creating a new affirmative duty of disclosure doctrine. Mr. Thorman admits he made no effort to ever seek clarification of how posted prices were set. He admits that although he was an active participant in the Flores case, Flores 1, that was commenced in April of 2000, and although as of that date, he admits in deposition he had concerns about his pay in prior season, he waits another 18 months before commencing this action. He submits no declaration or affidavit in response to our motion challenging his fraudulent concealment argument to escape the untimeliness of his claims. He submits no affidavit or declaration contending that he did anything to diligently pursue any question he may have had about how we set these posted prices. And I submit, Your Honor, recognizing that semen are wards of the Court, recognizing that the law has protected their interests to some extent, I submit that he has to be held to at least some minimal, minimal duty, as the law of fraudulent concealment requires, minimum duty to make inquiries. What does the law say the minimal duty is of a semen regarding his wages or his profit? What does the law say? The law certainly does not require a semen to affirmatively request being paid the wages he's due. I mean, the company has an obligation as any employer, it's not a maritime doctrine, to pay the wages that are due. But the question is, if there is a lawful limitations period set forth in a contract, does a semen have any less duty to act in accordance with a limitations period that he admits he understood in order not to have his claims be held to be time-barred? Congress has said to Mr. Thorman, if you choose to bring an interim claim against American Seafood Company's vessels, you have six months under 10602 to do so. And so I submit that Congress has already made it pretty clear that they don't view this employment relationship as one that requires some affirmative duty. And I think another example of that is that there is an accounting remedy. And again, I think this is along the lines of Your Honor's questions earlier. There is an accounting remedy in 10602. But that accounting remedy is not an affirmative duty. It's a remedy that is available to a semen who requests it. There is some baseline requirement that the semen act to protect his interests. And I don't think we're setting up some very strict standard for him. I think we're merely saying, if you've got a concern about your pay, go to your employer and ask about it. He never did. Do we have any evidence in the record as to why he tumbled to a problem at this later date? Well, the history, again, as we've tried to outlay in our brief, is that in the April 2000 season, which is the very next season, 2008 season, the second season, the last season, in that season, as I think the appellant's brief indicates briefly in reply, there was a big spike in the row market. And so as a result, at the end of the season, there was information that the posted price compared to the actual price of row was discrepant, and there were adjustments made and so forth. So this then resulted in a lawsuit that Mr. Thorman was very actively pursuing. An earlier lawsuit that he's a member of a class. An earlier lawsuit, Flores 1. And then, through the course of that, he then, 18 months later, right on the eve of trial of Flores 1, commences this lawsuit and tries to go back. Actually, originally, they tried to go back not just to 1996, they tried to go back originally to 1988, to any seaman that ever worked for American Seafoods Company under any posted price-based system. And then subsequently, through, you know, discussions with Judge Zille, they were asked to narrow the scope to a somewhat more, but the idea being they want to go back, you know, five years from the, or six years from the time they filed the case to take issue with the posted price. I think there's one other topic that I would like to briefly address, which is the actual notice and constructive notice prong of the fraudulent concealment doctrine. Judge Zille, and there's no appeal from this aspect of his ruling, Judge Zille dismissed Mr. Thorman's claim under the new contract for the 99B season on the alternative independent ground that in, of actual notice. And the basis was that in the Flores 1 litigation, this prior litigation that Your Honor alluded to a minute ago, in that litigation, the course of that litigation, in discovery, American Seafoods Company was asked to produce and did produce the internal template that reflected how they derived the posted prices for the 99B season. Judge Zille held on our motion for summary judgment that because Mr. Thorman was an active participant in Flores 1, that the knowledge of his counsel of that posted price template for the 99B season was imputed to Mr. Thorman under the normal rule of agency and imputing the knowledge of an attorney as an agent to a principal. We had asked the Court to likewise impute to Mr. Thorman the knowledge that his counsel had, per the McCoolin's action back in 1998, of how ASC established posted prices under the old contract. And that was that template. Perhaps I can ---- That's what Judge Zille said was too fact-intensive? That's what Judge Zille said was either ---- I think we have your argument in mind, and we ---- obviously, we can affirm on any ground, but then again, we can reverse on other grounds. So I think we have your argument in mind. We'll hear again from Mr. H. Thank you. Thank you, Your Honor. Your Honor, briefly to answer your question, how Mr. Thorman discovered he had a claim. In the Flores lawsuit, which concerned mainly this big spike in the one season, as Mr. Stahl stated, the company produced an offering circular prepared by the Bank of America for a private placement offering that the company was undertaking. In the offering circular, Bank of America represented that the company typically understated crew prices in seasons back. That's what put Mr. Thorman on notice, and the lawsuit was filed within six months of the production of that document. The contract that I heard Mr. Stahl talk about is not the contract that's present here. This is not a unit price contract. A unit price contract, the seaman gets the contract attached to the back of this list of prices, and he's told, you get paid based on these prices, or case rates they often are. That's not what happened here. In this case, he signed a contract that says he's to be paid on sales prices that were to be posted. He signed the contract, he got on the boat, he started work, the boat left dock, the boat headed for Alaska, and then the company posted these lists of prices that you've seen in the record. The representation to the seaman when he signed his contract was that these would be sales prices. Now, we agree with the company that because it is industry custom, the sales prices are net of sales costs. And, of course, they're estimates, and the contract makes that clear. But they're not unit prices. They're not a price that the crew member has agreed to be paid on. The crew member has signed up to be paid on sales prices. But a sales price that is posted at the sole discretion of the company, which does not equal market price necessarily, correct? It equals what we submit, the company's estimate of the market price, less its estimate of what its sales cost will be. In other words, the company's good faith estimate of sales price, not some arbitrary price, but sales price. And if it were an arbitrary price, this contract would have issues with 10601 that Your Honor's familiar with, because the company has to set out the terms with some specificity as to how the crew member is going to be paid. So it's an estimate of sales price, and the contract itself says, hey, we'll be high sometimes, we'll be low sometimes. It's an estimate. We're not perfect. But we're trying to hit the sales price. So when the company intentionally does not hit the sales price, when it, in the words of Bank of America, understates the sales price typically, it is breaching the contract with the seaman. That's our theory on the merits. And there's substantial evidence in the record, and much of it's quoted in the brief, that supports that theory. Now, are we winners for sure? Of course not. This is a summary judgment case. But the issue here is whether we, whether Mr. Thorman, has the right to bring this claim in court. So the issue here, of course, is fraudulent concealment. To briefly address Mr. Stahl's point that Mr. Thorman should have done more here, Mr. Thorman is a seaman. He's not a sophisticated businessman. And there is substantial evidence in the record that was accepted by Judge Zille of the futility that he would have in trying to pursue that, of how it would have been essentially impossible for him to find somebody to ask that would have given him the information. And the proof in that pudding comes from these prior lawsuits that Mr. Stahl was talking about. Counsel in prior lawsuits suing the company asked the same questions that they said Mr. Thorman should have asked. And in two instances, Mr. McReynolds in one lawsuit and Mr. Stokes in another, 30B6 representatives, testified what turns out to be falsely. I'm not accusing them of misrepresenting things, although they did. They probably didn't do it intentionally. But they both said the way we work it is we give an actual estimate of price less than an actual estimate of cost. Mr. McReynolds testified specifically the whole reason for giving a crew share, this is under this old contract, is so that they can benefit in the market. The market goes up. The market goes down. We all benefit or get penalized one way or the other. It's a profit sharing system between the crew and the company. Thank you. The case of Thorman v. American Seafoods is submitted. Thank both counsel.
judges: Ferguson, Beezer, McKeown